### J. N. MATTHEWS CO. v. CITY OF BUFFALO et al.

(Supreme Court, Equity Term, Erie County. December, 1910.)

1. WATERS AND WATER COURSES (§ 203*)—PUBLIC WATER SUPPLY—WATER RENTS.

For failure to pay a valid claim for willful or unreasonable waste or for fraudulent use of water, the supply may be cut off until the waste is stopped and all arrears paid.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 295; Dec. Dig. § 203.*]

2. WATERS AND WATER COURSES (§ 203*)—PUBLIC WATER SUPPLY—WATER RENTS—FRAUDULENT USE.

In an action against a city to restrain the cutting off of plaintiff's water supply, evidence *held* insufficient to show plaintiff was guilty of fraudulent use or unreasonable waste of water.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 296; Dec. Dig. § 203.*]

3. WATERS AND WATER COURSES (§ 203*)—PUBLIC WATER SUPPLY—RENTS.

An ordinance of the city of Buffalo (section 44), providing that water may be shut off in case of unreasonable waste and until such waste is stopped and all arrears are paid, does not authorize the discontinuance of water service for nonpayment of accounts that may be rendered for reasonable waste.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 295; Dec. Dig. § 203.*]

4. WATERS AND WATER COURSES (§ 203*)—PUBLIC WATER SUPPLY—CHARGES—UNREASONABLE WASTE.

In an action to restrain the discontinuance of plaintiff's water supply, evidence *held* insufficient to show that plaintiff had unreasonably wasted water so as to authorize the discontinuance of service.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 295; Dec. Dig. § 203.*]

5. WATERS AND WATER COURSES (§ 203*)—WATER RENTS—UNMETERED SERVICE.

Where a water consumer chose to take water through an unmetered line, it was liable to pay rates for unmetered service, and the fact that it supposed that it was paying the water through metered lines will not relieve it from the established rate for water through unmetered lines.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 294; Dec. Dig. § 203.*]

Action by the J. N. Matthews Company against the City of Buffalo and others to restrain defendants shutting off plaintiff's water supply. Injunction granted on condition of plaintiff paying defendants the amount found to be due for water used.

Lewis & Carroll, for plaintiff.

Clark H. Hammond and Harry D. Sanders, for defendants.

BROWN, J. For some years prior to June 13, 1910, the plaintiff has been furnished water by the defendant for the operation of the passenger and freight elevators and fire sprinkler system in its build-

ing at the corner of Washington and Exchange streets, in the city of Buffalo; such water being taken through an unmetered, four-inch pipe connected with defendant's main in Washington street, discharging into a 10,000-gallon tank in the basement of plaintiff's building, the pressure of water being about 30 pounds per square inch. To regulate the discharge a valve was placed at the end of the pipe in the tank, which valve was opened and closed by means of a lever upwards of six feet long, on the outer end of which a copper float was adjusted, the design being to close the valve by the raising of the float by the incoming water and opening the valve when the surface of the water was lowered by use by the lowering of the float. An outlet or overflow pipe, four inches in diameter, to the sewer, was connected with the tank, and placed about six inches from its top. From this large tank, near its bottom, was a seven-inch pipe leading to a pump which raised the water to a tank on the roof of the building, the discharge pipe into which tank was equipped with a valve and float regulator similar to the one above described. This upper tank was also equipped with an outlet or overflow pipe placed near its top and connected with the sewer. From the upper tank an eight-inch pipe led down and into the elevator cylinders in the basement operating such apparatus by the pressure of the column of water from the upper tank. After serving the purpose of operating the elevators, the water was discharged into the large tank in the basement from which it had been pumped. The operation of the pump was regulated by the position of the float in the upper tank, the design being that, when the float in that tank neared the end of the outlet or overflow orifice, it by proper connecting apparatus closed the steam pipe feeding the engine that operated the pump. Then, if the valve and apparatus were in proper working order, there could never get into either of these tanks any surplus water, and there would be no overflow or waste into the sewer. The water being used over and over as the elevators were operated, there was no consumption of water in such service. There was no water used in the fire sprinkler service unless a fire happened in the building. For the privilege of thus attaching the elevator and fire sprinkler plant to the city's Washington street main the plaintiff has paid for years the sum of $20 per year, and from the fact that no water was used or required more than enough to fill the tanks and pipes the rate of $20 must be deemed as ample to insure defendant against loss occasioned by the happening of a fire necessitating the actual use of water or by the happening of any other event that might entail temporary use in renewing the supply in the tanks, etc., to cleanse them, or temporary waste by leaks or defects that might happen in the system. It is a matter of common knowledge that leaks and waste do exist in water pipes and tanks. With the utmost diligence on the part of the most careful men leaks are discovered and waste does occur in the best of plumbing. The defendant maintains a force of inspectors known as "inspectors of leaks and waste," and, when the city established the rate of $20 for the elevator and sprinkler service that was known by the city not to require the consumption of any water in its ordinary operation, it must be presumed that the rate was intended to cover

whatever risks there might be of loss of water by reason of defects that might ordinarily be expected. The system was inspected by the inspector of the defendant on the 9th day of February, 1909, and found to be in a satisfactory working condition.

From near the bottom of the large tank in the basement a two-inch pipe led to other parts of the building, through which water was taken for toilet and other service. At about four feet from the large tank and in the two-inch line was placed a meter through which the water used for such toilet and other purposes was metered. This meter was read each month by an inspector of the defendant and from records thus obtained monthly bills were rendered for the water thus used. From the 9th day of February, 1909, up to June 13, 1910, no unusual or improper condition of the pipes and valves in the large tank in the basement was discovered by the inspectors reading the meter in the two-inch line leading from such large tank. On the 13th day of June, 1910, it was discovered by inspectors of defendant that an unusual noise was being made in the large tank by rapid rushing of water therein. An examination of the cause revealed the fact that the float valve on the end of the four-inch discharge pipe leading from the Washington street main was open; that the tank was nearly full of water, with water flowing out of the overflow or outlet pipe leading into the sewer, the float being submerged. An investigation led to the discovery that tied to the lever on which the float was attached, at a point about 10 inches from the valve, were 2 iron cogwheels weighing about 12 pounds, fastened with copper insulated wire. Upon removing these weights, it was discovered that the valve was in a defective condition; that it would not close so as to shut off the water. Inquiry made of the plaintiff failed to discover who tied the weights to the lever of the float valve, or for how long a time they had been thereon. An examination of the float valve in the upper tank on the roof of plaintiff's building also revealed that it was in a defective condition; that it would not close when the float was raised to its extreme height by the water in the tank. The inspectors of the defendant reported these facts to the commissioner of public works, who assumed that with the valve in the condition in which it was found by the inspectors the pipe would discharge its full capacity at that pressure of 500 gallons a minute, and determined that such valve had been in that condition from the 9th day of February, 1909, and that plaintiff had used or wasted 352,080,000 gallons of water, which at meter rates of 2 cents per 1,000 gallons constituted the basis of a bill for $7,041.60, which was rendered the plaintiff. On its refusal to pay the same the defendant commissioner notified plaintiff that, unless such bill was paid, the water service would be turned off the building to restrain which threatened act this action was brought.

The law undoubtedly is that for failure to pay a just and valid claim for willful or unreasonable waste, or for fraudulent use of water, the defendants could cut off the supply until such waste was stopped and all arrears paid.

The plaintiff has established that it is impossible to ascertain who tied the weights to the lever of the float valve or when it was done.

The purpose of placing the weights on such lever is unknown, except that one witness ventures the suggestion that as the valve was in a defective condition, owing to improper packing of the valve stem, the weights might have overcome the difficulties of operating the valve. None of the plaintiff's officers or employés have any knowledge of any character as to the placing of such weights on the lever. While it would be interesting to know why they were so placed, it is quite certain that they were not placed thereon to enable plaintiff to use the water, and it is quite inconceivable that they were placed for the purpose of wasting the water. The fact is that the plaintiff did not use the water that came through the discharge pipe into the large tank in the basement as a result of the placing of the weights on the lever. It has been seen that the only way plaintiff could use the water was to operate the elevators. After such use, the water was returned to the tank to be pumped out and used again in the same service. There was no use of the water in the fire sprinkler service, for the reason that there was no fire. The suggestion of the defendants' witnesses that the water might have been discharged into the sewer after service in the elevator cylinders is successfully met by the proof that there is no connection between the elevator cylinders and the sewer; that the connection is into the large tank in the basement. The only other outlet of the large tank in the basement through which the excess water could be used is through the two-inch line upon which the meter is placed near the tank. Water taken through this pipe is metered and paid for. If the weights were attached to the lever for the purpose of permitting the use of all the water that could pass through the valve, it is apparent that they could have been placed at the extreme end of the lever near the float instead of within twelve inches of the valve, the float lever being about six feet long. The placing of weights so near the valve as to be of little use in keeping the valve open, it is evident that they were not placed for the purpose of fraudulent use or waste. The contention of fraudulent use must be dismissed.

Was there unreasonable waste? If so, how much and for how long a period, and what should plaintiff pay therefor? The testimony is that, when water was being discharged into the large tank with weights attached to the lever, the incoming rushing water made such a noise that it would plainly be heard all around the basement in the vicinity of the tank. No person, either the defendant's inspectors who read the meter within four feet of the large tank monthly, or any of the plaintiff's employés whose work took them constantly near the large tank, ever heard this noise of rushing water prior to June 13, 1910. The testimony is that with water coming into the large tank in the quantities charged in defendant's bill with the pump of plaintiff in operation to supply the elevator service the volume of water is so large that it will overflow the large tank in three minutes after water reaches the bottom of the outlet or overflow pipe; that the large tank did not in fact overflow at any time during this period charged for. There may have been waste, but it clearly appears that it was not at the rate of 500 gallons a minute. To say that there was unreasonable waste at any time there must be some-

thing upon which the quantity of waste can be approximately determined. It is impossible to say that there was unreasonable waste unless it is known how much the waste was. The existence of an apparent water line near the top of the large tank above the bottom of the outlet or overflow pipe would indicate that when the water stood at that level there was water running away to the sewer; but such line furnishes no evidence as to how long the water stood at that level.

It is very questionable whether it could be said that there was an unwarrantable waste, provided no more water ran away than could be bought at meter rates for the $20 fixed as the flat rate for the elevator and sprinkling service. Such sum would pay for 1,000,-000 gallons at 2 cents for 1,000, entitling plaintiff to use 114 gallons every hour for every day for one year. To say that plaintiff is chargeable with unreasonably wasting any water, it should appear that water in fact, in unreasonable quantities, did go to waste. The defendant, claiming the right to shut off the water from plaintiff's building, based upon the charge that plaintiff has unreasonably wasted its water, is called upon to prove some facts from which it can be found that there was an unreasonable waste. Section 44 of defendants' ordinances provides that water may be shut off in case of unreasonable waste until such waste is stopped and all arrears are paid. It is quite significant that power does not exist to discontinue water service for nonpayment of accounts that may be rendered for reasonable waste. Of course, a waste of 500 gallons a minute would be unreasonable, and, if the proof of finding the valve held open by weights on the 13th of June, 1910, warrants the assumption that the full capacity of a four-inch pipe carrying water at thirty pounds pressure was going to waste, and that the conclusion is warranted that such waste has continued from February, 1909, to that date, then there has been established an unreasonable waste that authorizes the defendant to shut off the water from the building as threatened; but it is not believed that such discovery of the presence of weights leads to such a conclusion. The only fact upon which the claim of 500 gallons a minute is based is the known capacity of such a pipe under such a pressure. It is not known whether the valve was completely opened so as to permit such a volume of water to pass through it or not. The fact is that such a volume of water entering the tank only three minutes would elapse before it overflowed over its top after the water reached the bottom of the outlet or overflow pipe. The fact is that the tank did not overflow at that time. The assumption that there was 500 gallons a minute waste on June 13th is an erroneous one. After the discovery of the weights being attached to the lever of the valve, experiments were made to ascertain precisely how much water would flow through the four-inch pipe. For this purpose a meter was used, the same weights were applied to the lever, and it was found that with water in the tank at the bottom of the outlet or overflow pipe there came into the tank through the float valve 54.7 gallons a minute. The weights were removed from the lever of the float valve and the water entered

the tank through the float valve at the rate of 55.2 gallons a minute, as registered by the meter; thus demonstrating that the use of the weights decreased the volume of water entering the tank one-half a gallon a minute, instead of increasing such inflow. The experiment was made by the city engineer of the city of Cleveland, and with such a result it is very significant that no testimony was offered by the defendant questioning its accuracy. Having in mind that the burden is on the defendants of showing an unreasonable waste of water, the conclusion is satisfactorily reached that whatever waste of water there has been was due to the defective condition of the valve itself, rather than to the presence of the weights. The fact is that the valve intended to regulate the discharge from the four-inch pipe was in a defective condition. The valve was produced upon the trial and its defect explained to consist of an injury to the valve stem preventing the valve from properly engaging its seat; that is, from properly and tightly closing the inflow orifice or seating itself in proper place. Such fact has a great importance in determining the question of unreasonable waste. If the waste was brought about by the intentional act, wrongful act of tying the weights to the lever of the float valve, it would go a long ways toward satisfying the mind that any waste would be unreasonable. If, however, the waste was brought about by the defective valve, caused by an accident to the valve stem and such condition was unknown and would not likely be discovered by the plaintiff, then it is quite likely that such waste would be such a waste as was provided for by the flat rate of $20 per year which involved no substantial use of water in the ordinary operation of the elevators and sprinkler system. The fact that the upper and lower tanks were each provided with outlet or overflow pipes connected with the sewer, and had been so maintained to the knowledge of defendant's officers, is an indication that the flat rate of $20 contemplated that in emergencies brought about by accident, defects, or other causes there would likely be more or less water going to waste.

Whatever waste there was having been satisfactorily shown to have been caused by the defective valve rather than by the application of the weights to the lever of the valve, it necessarily follows that the cause of the waste was a reasonable one; this being so the only remaining question is whether the quantity of the waste has been shown to have been of such an extensive character as to charge plaintiff with knowledge thereof, for, if the plaintiff knew of an extensive waste or ought to have known of it, it would undoubtedly be liable for the damage to the defendant. All that is known of the quantity of the waste is the fact discovered June 13, 1910, that a large quantity of water was passing through the float valve in the lower tank and water was running out of the overflow pipe into the sewer. It is known that none of the water that had come through that valve prior to that date had been used for any purpose except the elevator service, and except what water was metered through the two-inch pipe leading from the tank for the toilet and other service. Upon the discovery of the weights and defective float valves, plaintiff's

water service system was thoroughly inspected, and all service pipes supplied with meters. For years all the water entering plaintiff's building has been metered except for the elevator service and a small three-fourths inch pipe referred to later. Plaintiff's account for water through meters from September 12, 1909, to October 13, 1909, was $22.52; for October 13, 1909, to November 11, 1909, was $21.17; for like periods in 1910 September 12 to October 13, 1910, it was $23.35, and October.13 to November 11, 1910, it was $20.40, demonstrating that plaintiff's use of metered water in the two given months of 1909 was $43.69 and for the two like months of 1910 it was $43.75. The two months of 1910 included water for elevator service, while in 1909 it was unmetered. It certainly follows that plaintiff cannot be charged with using any water obtained by reason of weights on the lever or of the defective valve. If the figures of 55 gallons per minute ascertained as being the quantity of water passing through the defective float valve with weights or without weights at the time of the experiment shortly after the discovery on June 13, 1910, be accepted as a basis for computation of the quantity wasted, it is at once seen that any result would not ever approximate the true quantity for two reasons: First, plaintiff has already paid for all of the water taken out of this large tank through the two-inch metered pipe; and, second, the number of days.of such waste is unknown. There has been no data submitted whereby the court can ascertain the quantity of this alleged waste, and having in mind that the $20 flat rate for elevator and fire sprinkler service would permit the use of 115 gallons each hour for the entire year at meter rates, and the defendant being bound to prove that the plaintiff has unreasonably wasted water, the conclusion is reached that the defendant has not established its right to shut off the water from plaintiff's building unless plaintiff pays the bill rendered.

In Brass v. Rathbone, 153 N. Y. 435, 47 N. E. 905, the bill was rendered after it had been determined by meter that plaintiff was using 2,000 to 5,000 gallons daily when he was only entitled to use 150 gallons daily at the $15 water rent that he was paying. The Court of Appeals properly held that defendant had a right to shut off the water unless bill was paid. This case involved the actual, intentional use of 2,000 to 5,000 gallons daily, and the attempt to pay for only 150 gallons.

In Krumenaker v. Dougherty, 74 App. Div. 452, 77 N. Y. Supp. 467, the water was illegally obtained for use by shutting off the water through the metered pipe and opening a stop cock in the unmetered line. The record kept of the meter when the unmetered service was in operation showed a consumption of 41 cubic feet per day for 56 days. When the unmetered pipe was discontinued and all water used forced through the meter, the consumption was 744 cubic feet per day for 19 days. With these figures as a basis, a computation was made resulting in a bill for water unlawfully used of $991.19. The plaintiff offered $600 in compromise. It was refused, and defendant threatened to shut off the water from plaintiff's premises. The plaintiff procured a temporary injunction to be issued, and the Appellate Division, reversing the order continuing the injunction, said:

"It is evident that the exact amount of water which passed through the unmetered service pipe and of which the city was defrauded of revenue can never be accurately measured or ascertained. It must always be the subject of approximation based substantially upon a consideration of the facts as ascertained from the inspection, the measurement of the supply which passed through the meter after the unmetered service pipe was disconnected, and the volume of plaintiff's business. It is evident, also, that the plaintiff understood, as fully as did the city, the illegal use which he had been making of the unmetered service pipe, and of the fraud which he perpetrated upon the municipality. His offer of $600 in compromise of the bill, coupled with his admission of knowledge of the service pipe, although accompanied with a denial that he had made use of it, is plainly significant of guilty knowledge upon his part."

The right to shut off the water was awarded the defendant because the plaintiff failed to pay the bill as rendered. In this case it was established that plaintiff's meter showed 703 cubic feet of water more per day when all the water he used went through the meter than it did when by the use of the unmetered pipe only part of the water was metered.

The court also said:

"It is evident upon the whole record that the plaintiff has been treated as fairly by the defendant as he was entitled. By his act the accurate measurement of the amount of water which he had consumed and for which he had not paid can only be approximately determined, and he is in no position to ask that the court restrain any rule in his favor."

This case involved the fraudulent use of water by means constituting larceny. No such condition can be urged in the case at bar.

The plaintiff did not use any water from the two-inch pipe extending from defendant's main in Exchange street into the oil room in the basement, and the defendant has no justification for the threat to shut the water off of plaintiff's building unless the bill rendered for that alleged service is paid.

After the commencement of this action, the plaintiff made the discovery that there were certain toilet fixtures in its building using defendant's water which were theretofore supposed to be supplied through metered service pipes which in fact receiving water from defendant's street main through unmetered pipes, and that plaintiff had not paid anything for such service. Proof was given as to these fixtures and data furnished upon which the court was asked to ascertain what sum should be paid by plaintiff for such water so used. This service pipe consisted of a three-fourths inch pipe leading from defendant's Washington street main direct to the fixtures, and was not connected with any of the pipes in plaintiff's building. From May 1, 1890, to May 1, 1904, 2 closets and 2 wash bowls had this service, and from May 1, 1904, to July 26, 1910, 13 closets, 5 urinals, 2 offices, 5 wash bowls, 1 wash sink, and 1 sidewalk sprinkling bibb were served therefrom. Using the comparative charge for like service to like fixtures in the building at meter rates as a basis for computation, a result is reached of $194.65 for this unpaid service. Accepting the water flat rates as specified in the city ordinance for unmetered lines as a basis for such computation the result of $390.02 is produced. The fact that the plaintiff chose to take its water for these fixtures through an unmetered line would seem to indicate

that it ought to pay the rates provided for unmetered service. The economy of using city water through a meter could not be better illustrated and plaintiff has long been acquainted with such advantage. The fact that plaintiff supposed it was taking and paying for this water through the metered lines in the building ought not to relieve it from the city's established rates for water through unmetered lines.

The conclusion is reached that the plaintiff is indebted unto the defendant in the sum of $390.02, and upon payment thereof plaintiff may have an injunction restraining the defendant from shutting off the water from plaintiff's building as threatened by the defendant commissioner.

The finding of the weights tied to the lever of the float valve was a circumstance of such a suspicious character that the defendant commissioner was warranted in the absence of any explanation in inferring that they had been attached for the purpose of permitting a wrongful use of water. In view of that fact, and also that the plaintiff is indebted unto the defendant city for use of water through an unmetered line, no costs are awarded.

Judgment is accordingly ordered.